ZELHAVER *v.* KOEPKE.

1. NEGLIGENCE—FIRE ESCAPES—COMMON LAW.
   At common law no duty rested on owner of building to equip it with fire escapes.

2. SAME—NOTICE—STATUTES.
   Where owners of three-story building discovered necessity for making certain alterations in order to maintain proper exit to fire escape, defense to action against them for failing to maintain proper exit may not be predicated on fact that no notice to make such alterations was ever given them by city council as provided by statute (1 Comp. Laws 1929, §§ 2737–2742).

3. SAME—CONTRIBUTORY NEGLIGENCE—EMERGENCY.
   Law makes allowance for acts done in emergency and sudden peril, and for lack of coolness and judgment incident thereto.

4. SAME—PRESUMPTIONS—FIRE ESCAPES.
   That woman suddenly confronted with danger from fire on third floor neglected to break glass in window to reach fire escape or to avail herself more quickly of some other means of exit when she found she was unable to raise window, *held,* not to render her guilty of contributory negligence as matter of law, since it will be presumed that she did what seemed to her proper under circumstances.

5. TRIAL—INSTRUCTIONS—NEGLIGENCE—FIRE ESCAPES—APPEAL AND ERROR.
   Instruction of court as to duty of owners of building to see that
   . orders to make needed alterations to window leading to fire escape on third floor were carried out, *held,* not reversible error, where meaning was clear, although language used was somewhat confusing.

6. NEGLIGENCE—DUTY TO MAINTAIN SAFE EXIT TO FIRE ESCAPE.
   That owners of building employed carpenter to make needed alterations to window to make it safe as exit to fire escape would not relieve them from liability if they failed to see that said alterations were made within reasonable time, if in fact they were never made (1 Comp. Laws 1929, §§ 2737–2742).

---

On liability for injuries caused by lack or insufficiency of fire escapes, see annotation in 15 L. R. A. 160; 10 L. R. A. (N. S.) 177; 21 L. R. A. (N. S.) 178; 39 L. R. A. (N. S.) 744; L. R. A. 1917C, 1153.

As to excessiveness of verdicts in actions for personal injuries other than death, see annotation in L. R. A. 1915F, 30; 46 A. L. R. 1230.

7. TRIAL—INSTRUCTIONS—NEGLIGENCE—APPEAL AND ERROR.

Defendants' claim that court instructed jury that they ought to find defendants guilty of negligence, *held*, not sustained by record, which shows that any misunderstanding was cleared up by counsel's question and court's answer.

8. NEGLIGENCE—WEIGHT OF EVIDENCE.

In action for personal injuries alleged to have been due to defendants' failure to maintain safe exit to fire escape, verdict for plaintiff *held*, not against great weight of evidence.

9. DAMAGES—EXCESSIVE VERDICT—PERSONAL INJURIES.

Verdict of $12,300 for injuries caused by fire to woman 32 years of age with life expectancy of 33 years, who was earning $30 per week with room and board, *held*, not excessive, where she was confined in hospital for nine weeks, was treated by doctor for several months, suffered much pain, there is evidence of permanent injury to right hand and joints of right arm, and her person has been disfigured and is likely to remain so.

10. EVIDENCE—EXHIBITING WOUNDS TO JURY.

Plaintiff suing for personal injuries caused by fire through defendants' alleged negligence was properly permitted to exhibit her wounds to jury.

Appeal from Genesee; Black (Edward D.), J. Submitted April 22, 1932. (Docket No. 122, Calendar No. 36,030.) Decided December 6, 1932.

Case by Maye Zelhaver against Arthur C. Koepke and another for personal injuries alleged to be due to defendants' negligence in failing to maintain proper exit to a fire escape. Verdict and judgment for plaintiff. Defendants appeal. Affirmed.

*Wilson & Hoffman,* for plaintiff.

*Butzel, Levin & Winston* and *Cook, Sheppard & Stipes (Chris M. Youngjohn* and *Carl L. Whitchurch,* of counsel), for defendants.

SHARPE, J. In this action plaintiff seeks to recover damages for personal injuries sustained by her in a fire which destroyed the Paterson building, in the city of Flint, on the evening of March 11, 1930. The defendants were lessees of the building under a 60-year lease. It was three stories in height. A fire escape led from a window in the hallway on the third floor into an alley. Plaintiff was employed as "general supervisor" in a beauty shop located on this floor, and her claim is based upon the negligence of the defendants in failing to maintain this entrance to the fire escape in a condition so that it could be freely used by occupants of the third floor in case of fire in the building. She had verdict and judgment for $12,300, of which defendants seek review by appeal.

The beauty parlor occupied several rooms on this floor. There were stairs and an elevator leading to it from the ground floor. Russel Fabian was at that time employed to instruct those engaged in that work, and the plaintiff sat watching him making an experiment when she discovered smoke coming into the room and called Fabian's attention to it. She testified:

"Well, I went to the door of the laboratory out —be into the hallway, toward the front of the building, there was smoke coming up the areaway and out of the staircase, around the radiator, just everywhere, and there is a desk in the lobby where we have the telephone, and I stopped and called the fire department, and the smoke was coming up higher and blacker all of the time"—

that there was a large areaway in the center of the building and the smoke and heat were soon pouring up it and the stairway which led from the floor below; that she "ran to the back, toward the fire

escape," and "tried to raise the window, tugged at it," but "could not raise it;" that—

"I went in the laboratory, right at my right hand, to see if I could get something to break the window with, and I turned back, the smoke was coming up that way so bad I didn't dare go out there to try it any more"—

that she went back through the rooms and met with big gusts of smoke, and finally went to a window which was open and crawled on it and hung there until the fire department opened up a net and she dropped into it. She exhibited her injuries to the jury, and was apparently badly burned.

She further testified that she had before that tried to raise the window leading to the fire escape, but could not do it alone, and that it had been in that condition all of the time she had worked there; that in February, 1930, after Valentine's day, she helped a Mrs. Farless raise it, and they put a block of wood under it to hold it up.

Russel Fabian, the instructor before referred to, testified that he had been employed at the beauty parlor since the latter part of January, 1930; that he was preparing a new formula for finger-wave fluid when plaintiff called his attention to the smoke; that when she went to the telephone he went to get his formulas; that he saw her run to the window leading to the fire escape, and afterwards into another room; that he tried to open the window; "I might have opened it, but was unable to; I could not stand there in the smoke;" that he then tried to get her in a place of safety, but she was screaming and resisted his efforts; that he saw her go to the open window, and he went to the next one, and that he dropped into the net soon after she did. He further testified that he had raised the window lead-

ing to the fire escape before that time, but had to stand on a stool to do so; that he had never seen one woman raise it, but had seen two of them do so, one on each side, and that a piece of wood was put under it to keep it up, and that the smoke and heat were so intense that escape by the stairway was impossible.

Myrtle Farless, an employee in the beauty shop at the time of the fire, testified that she had tried to lift the window leading to the fire escape, but could not do so; that she had with assistance (one at each side) raised it several times, the last time she fixed as three or four weeks before the fire, and that it was kept up by placing a piece of wood under it.

Carrie Fox, also an employee, testified that she had raised the window on several occasions, but always had help to do so, the last time "maybe a week, maybe within two or three days" before the fire; that she first raised it in January, and that it "was always hard to open."

Thelma Jardie testified that she had worked in the beauty parlor since the first of January, 1930; that she had several times opened the window, but always had help to do so; that she opened it in February, and it opened as hard as at previous times.

Berneda Eckart testified that she had worked there since November, 1929; that she had helped others to raise the window, the last time in March, and it was just as hard to open then as before.

The defendant Koepke testified that he had his office on the second floor of the building; that he examined the window leading to the fire escape about the first of January, 1930; that it was "a double-hung window," "a window that has two sash, and slides up and down in grooves in the sash;" that it then had no weight or pulleys upon

it; that one had to lift the weight of the window (about 45 pounds) to open it; that he directed a man named Robson, who had been in his employ for 10 years, to repair it; that he did not afterwards examine it to see that the repairs had been made; that the glass in the window was double strength and about 42 inches in width; that his firm received a bill (producing it) from the Hubbard Hardware Company for the material used by Robson in repairing the window, the items in which were charged on January 8th and January 27, 1930; that defendants had been lessees of the building for about two years, but never had received any orders from any official of the city to repair the window.

Peter J. Weidner, the city building inspector, testified that he examined the window leading to this fire escape in August, 1929, and concluded "that it was safe," and that he made no requirement as to any change in it.

Fred Robson, the carpenter employed by Mr. Koepke to repair the window, testified that he made such repairs in the last days of January, 1930; that he took the sash out and weighed it, and it weighed about 45 pounds; that he stretched a canvas covering on the window when he removed the sash; that he put in the sash balances to fit the weight of the window, having procured them at the Hubbard Hardware Company's store, and that then the window "slid up and down very nicely;" that it did not "jam or stick," and that one could then "take your hand and raise it up very easily."

In rebuttal, the plaintiff and two of the employees in the beauty parlor above referred to testified that they were so employed in the latter part of January, 1930, and did not see any canvas stretched over the window opening as testified to by Robson.

Upon the record thus made, the trial court, after denial of defendants' motion for a directed verdict, submitted the case to the jury, who found as above stated.

It is well settled that at common law no duty rested upon the owner of a building to equip it with fire escapes. Act No. 170, Pub. Acts 1883 (1 Comp. Laws 1929, §§ 2737–2742, inclusive), is entitled:

"An act to provide for the construction of fire escapes from hotels, boarding and lodging houses, also to afford the necessary escape from fire in business places, and in buildings used for public and private assemblages."

Section 1 imposes a duty upon the owner, proprietor, lessee, or keeper of any hotel more than two stories in height to provide fire escapes from each story above the ground floor.

Section 2 requires the owner, proprietor, or lessee of any building more than two stories in height where male or female help is employed above the second floor to provide suitable fire escapes as provided in section 4 thereof.

Section 4 imposes the duty upon the board of building inspectors, created by Act No. 226, Pub. Acts 1879 (2 Comp. Laws 1929, § 8862), to examine from time to time, at least once in each year, all buildings more than two stories in height and to submit to their respective township or village boards or common council—

"such recommendations, in addition to the provisions and requirements of this act, as they may deem proper and necessary for the protection against fire, and the escape therefrom, in the several places named in the preceding sections of this act."

Section 5 imposes the duty upon such officials, on receiving such report, to direct such alterations and

additions as they may determine to be necessary, and section 6 imposes a penalty for a failure to comply therewith.

In his instructions to the jury the trial court referred to this statute, and read certain sections thereof. He then stated to them—

"The first question for you to determine in this case, and the very important one, is whether or not the defendants in this case were guilty of what is known as negligence."

He then very carefully defined that term, concluding with the question, "Was there at that time a proper means of exit from that building in case of a fire?"

Defendants' counsel insist that the statute imposed no liability upon them, for the reason that they had not received any notice from the common council of the city of Flint directing alterations or additions to be made to the fire escape. This building was equipped with what is conceded to be a suitable fire escape. The question here presented is whether a proper means of exit from the building thereto was provided. If it be conceded that under the statute no legal duty was imposed on the defendants to make changes or alterations thereto unless notified to do so, it clearly appears that the defendant Koepke personally examined the window about the first of January, 1930, and determined that its weight (about 45 pounds) was such that it needed weights upon it, and directed Mr. Robson to repair it in that respect.

The purpose of the notice above referred to is to apprise the owner or lessee that "needful alterations and additions" should be made, and when the defendant Koepke, himself, discovered the necessity

therefor, and directed that suitable alterations and additions should be made thereto, defense may not be predicated upon the fact that such notice was not given.

It is urged that "there was no showing of any negligence" upon the part of the defendants "which was the proximate cause of plaintiff's injury." This claim is largely based upon the neglect of the plaintiff to avail herself of the other means of exit from the building when the smoke was first discovered by her. It does not appear that she had any knowledge that the building, except the outside walls, was entirely of wooden construction, nor can it be said as a matter of law that she was chargeable with notice that the fire would spread so quickly therein. It is insisted that she should have used a chair or other object to break the glass in the window, and thus secure her escape. The jury had the right to presume that she desired to protect herself from injury, and that she did what seemed to her, in her then condition of excitement and panic, the proper thing to accomplish that result. The instruction of the court as to her conduct after her danger became apparent was, we think, well within the rule announced in *Myler* v. *Bentley*, 226 Mich. 384, 386 (23 N. C. C. A. 859):

"The law makes allowance for acts done in an emergency and in sudden peril and for lack of coolness of judgment incident thereto."

The testimony of the building inspector meets with well-deserved criticism. It is established beyond question that at the time he testified that he examined the window it weighed about 45 pounds and had no sufficient weights upon it. He must have known that women were employed on this floor, and it is almost inconceivable to believe that after ex-

amination he concluded that it was a safe exit to the fire escape in case of need. It also appears that the defendant Koepke examined it a few months later (and there is no evidence of change in the meantime), and he himself concluded that it was unsafe and ordered the necessary changes made.

Error is assigned upon certain portions of the charge. After instructing the jury that if the repairs to the window had been made as testified to by the witness Robson, he told them that—

"the defendant would not be guilty of negligence, unless you find from the evidence in this case that the defendant should have gone back and made an examination of this window after the carpenter had completed it,"

and that—

"If you find at the time this window was fixed by the carpenter, and you find he did fix it, and it would work, and if you find also from the evidence that the time elapsing, for the period between the 27th of January and the 11th of March, during which time it had not been examined, you find that was reasonable for the defendants not to examine it in the meantime, they would not be guilty of negligence, if you find the window worked the way it ought, but if you find it was the duty of the defendant to examine this window after the carpenter had done his work, then you would say he hadn't performed his full duty, and he would be guilty of negligence. That is to say, had the defendants in this case acted as ordinary, prudent, careful men would have acted under like circumstances? That is the law."

We are unable to discover any reversible error in this instruction. The language used may be a little confusing, but the meaning intended to be conveyed seems clear. If the duty devolved upon the defend-

ants to keep this window in a condition to afford a reasonably safe exit to the fire escape, as we here hold, it cannot be said as a matter of law that they were relieved therefrom by the mere employment of Robson to make it so.

In the closing paragraph the court said:

"Now, I think I have been brief. I don't want to say anything in any manner tending to say things that might puzzle you in any way, but I would repeat this: You ought to find, you must find in the case that the defendant was guilty of negligence—as I said, and I repeat it again, to give you that definition of negligence, which is the doing or not doing of that which the ordinary, careful, prudent man would have done under like circumstances. Contributory negligence is the same thing, did the plaintiff in this case act as an ordinary, careful, prudent person, would have acted under like circumstances. Now, those are the definitions of negligence and contributory negligence, and if you find that the defendant was guilty of negligence and the plaintiff free from negligence, then you go to the consideration of damages, and that is left to the fair, honest intelligence of jurors."

It is insisted that the court thereby instructed the jury that they "ought to find," "must find," "that the defendant was guilty of negligence." That it was not so intended is apparent from what followed. After a suggestion by plaintiff's counsel as to the effect to be given to the mortality tables, which had been offered in evidence, had been disposed of, defendants' counsel said to the court:

"*Mr. Youngjohn:* I don't know if I misunderstood Your Honor, in your last summary of your charge, it wasn't your intention to instruct the jury that they ought to find defendants were guilty of negligence?

"*The Court:* I said in order to find for the plaintiff they would have to find the defendant was guilty of negligence.

"*Mr. Youngjohn:* Did you not instruct that the jury should find?

"*The Court:* It is their duty, in the first place, to find whether the defendants in this case were guilty of negligence."

It thus clearly appears that the effect of the language used was dispelled by the pertinent question of counsel and the reply of the court thereto. Many times during the charge the court impressed upon the jury that the negligence of the defendants as a matter of fact must be established to enable the plaintiff to recover.

We have set forth the testimony of the witnesses at some length. There is much conflict. We have given it careful consideration, and cannot say that the verdict rendered is against the great weight thereof.

Counsel insist that the verdict is excessive. The plaintiff was 32 years of age at the time of her injury. Her expectancy of life was 33 years. She was earning at that time $30 per week, with room and board. She was confined in a hospital for about nine weeks, and was treated by a doctor for a number of months thereafter. She suffered much pain from the effect of the burns and the treatment therefor. There is evidence of permanent injury to her right hand, and the joints of her right arm. The trial court properly permitted her to exhibit her wounds to the jury. Potter, Michigan Evidence, p. 306. That her person has been disfigured, and is likely to remain so, is apparent. The trial court, who saw her upon the witness stand and heard the doctor testify as to her injuries and the suffering she

endured in his efforts to improve her condition, was of the opinion that the verdict was not excessive. We cannot say that the amount thereof necessitates a reversal for that reason or a reduction of the same on our part.

The judgment is affirmed.

CLARK, C. J., and McDONALD, POTTER, NORTH, FEAD, and WIEST, JJ., concurred. BUTZEL, J., did not sit.